CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 06 2019

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 7:19-cr-62 |
| v. | ) | |
| | ) | |
| KEITH OBIE GATES, | ) | By: Michael F. Urbanski |
| | ) | Chief United States District Judge |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter comes before the court on defendant Keith Obie Gates's ("Gates") motion to suppress evidence of a firearm found on his person during a search incident to arrest and to suppress statements made during this arrest. ECF No. 34. The government responded to this motion on November 12, 2019 and included with its response a video showing the entry into Gates's home, the arrest of Gates, and the search incident to the arrest from the arresting officer's body camera. For the reasons explained below, the court **GRANTS in part and DENIES in part** Gates's motion.

I.[1]

Late in the evening on May 21, 2019, Roanoke City 911 operators received reports from two callers describing a disturbance at 810 Mountain Avenue. ECF No. 35-1. The first caller reported a loud disturbance between a male and a female; the second caller said that "the male is beating the female up," and that she could hear the sound of the male punching the female. Id. Officer Preston Hill, who was assigned to patrol this part of Roanoke, was

---

[1] These facts are not in dispute—they are supported by the 911 call logs, arrest warrant, and video footage from the arresting officer's body camera. These have all been submitted to the court. ECF Nos. 35-1, 35-2, and 35-3.

sent to address the disturbance. ECF No. 35-3, at 5:50. Officer Hill had checked active warrants earlier in his shift and was aware of a non-permitted (i.e. requiring arrest) bench warrant outstanding for Gates. See ECF No. 35-2.

When Officer Hill arrived at 810 Mountain Avenue, he spoke briefly with the second caller who was waiting for him on the front porch of the residence. ECF No. 35-3, at 8:55. She told Officer Hill she could hear from outside that "[h]e's [Gates] has been beating her." Id. When asked who was inside the residence, she told Officer Hill specifically that it was "Keith Gates." Id. Officer Hill was able to hear raised voices from outside the residence and testified that he recognized from prior visits the voice of Gates. Id.

At this point, Officer Hill entered the residence and found Gates in a dispute with a woman. ECF No. 35-3, at 9:55. After asking what was happening, Officer Hill placed Gates in handcuffs and began a search of his person, during which he discovered a pistol in his pocket. Id. at 11:40. He then asked Gates if he was "allowed to have a gun on [him]." Id. at 13:09. Gates responded that the gun had been in the shorts he was wearing when he put them on to go outside, and that the gun did not belong to him. Id. Officer Hill asked Gates if he had ever been charged with a felony. Id. at 13:55. Gates told Officer Hill he had been convicted of a felony. Id. at 14:07. Officer Hill and Gates discussed whether Gates was permitted to be in the same house with a firearm for several minutes. Id. at 13:55–15:00. As Officer Hill was taking Gates to his car, he mentioned needing to check back at the station whether Gates had any prior felony convictions, to which Gates responded, "I just told you I've got a felony conviction." Id. at 18:08–18:26. This led to further discussion of Gates's past felony conviction, including whether Gates was charged as an adult or a juvenile and

what implications this would have regarding Gates's possession of the pistol. Id. After this discussion, Officer Hill took Gates to the police station.

## II.

Gates argues that evidence of the firearm found on his person ought to be suppressed because the entrance into his home, and the search that revealed the firearm, was unconstitutional. He also argues that his statements to Officer Hill about the firearm and his past conviction must be suppressed. Gates contends that Officer Hill's entrance into his home was warrantless, and thus presumptively unconstitutional. He argues that neither of the possibly applicable exceptions to the warrant requirement, exigent circumstances or execution of an arrest warrant, can redeem Officer Hill's entrance into his home. Finally, he argues that, even if Officer Hill's warrantless entry was justified, the questioning that occurred before Gates was read his Miranda rights violated the Fifth Amendment, and thus his answers must be suppressed.

The court finds that exigent circumstances did permit a warrantless entry into 810 Mountain Avenue, for the reasons below. The court agrees with Gates, however, that Officer Hill's questioning violated Gates' Fifth Amendment rights against self-incrimination. The answers to these questions thus must be suppressed.

## A.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Cont. amend. IV. This means that, "[a]bsent exigent circumstances, [the] threshold [of an individual's house] may not reasonably be crossed without a warrant." Payton v. New York,

3

445 U.S. 573, 590 (1980). "The most basic principle of Fourth Amendment jurisprudence . . . is that warrantless searches and seizures inside a home are presumptively unconstitutional." United States v. Yengel, 711 F.3d 392, 396 (4th Cir. 2013). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." Brigham City v. Stuart, 547 U.S. 398, 403 (2006). "One such exception is when exigent circumstances justify the warrantless entry of a home." Yengel, 711 F.3d at 396.

Such exigent circumstances, according to Supreme Court precedent, include entering a home to fight a fire, prevent the destruction of evidence, or continue in "hot pursuit" of a fleeing subject. Brigham City, 547 U.S. at 403. This list is not exhaustive, however, and generally speaking, situations that are "enveloped by a sufficient level of urgency," may constitute an exigency and justify a warrantless entry. Yengel, 711 F.3d at 397. The Supreme Court described the justification for a warrantless entry as "[t]he need to protect or preserve life or avoid serious injury," Brigham City, 547 U.S. at 403, the test for which is whether the circumstances known to [an officer] at the time of entry justified an objectively reasonable belief that an emergency requiring immediate entry to render assistance or prevent harm existed." Hunsberger v. Wood, 570 F.3d 546, 555 (4th Cir. 2009).

The Fifth Amendment to the Constitution guarantees that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This privilege against compulsory self-incrimination is safeguarded by procedural rules dictating the terms of custodial interrogations. Miranda v. Arizona, 384 U.S. 436, 444 (1966). These rules require law enforcement officers to warn a suspect of his rights and to obtain a waiver

4

of those rights before conducting custodial interrogation, with limited exceptions. United States v. Mashburn, 406 F.3d 303, 306 (4th Cir. 2005).

A suspect is "in custody" for Miranda purposes if "there [was] a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." Stansbury v. California, 511 U.S. 318, 322 (1994). The term "interrogation" includes not only "express questioning," but also "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). In deciding whether statements constitute "interrogation," courts focus on the perceptions of the suspect, rather than the intent of the police. Id. The government bears the burden of "demonstrating the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 364 U.S. at 444.

## B.

Domestic violence situations are not per se exigent. United States v. Najar, 451 F.3d 710, 719 (10th Cir. 2006). Such situations much justify the test articulated in Hunsberger; the government must show the existence of exigent circumstances. Such circumstances justifying the belief in a present emergency requiring immediate entry are clear here. Roanoke City police dispatch received not one, but two reports of a domestic disturbance. One of these reports indicated that a man was "beating the female up" and that the caller could "hear the male punching the female and the female screaming." The second caller waited for Officer Hill on the front porch of 810 Mountain Avenue, identified herself as a friend of the woman inside, identified Gates by name as the other individual inside, and repeated that "[h]e's been

beating her." Officer Hill could hear yelling inside the apartment. These circumstances known to Officer Hill at the time of the entry justified an objectively reasonable belief that entry into 810 Mountain Avenue was necessary to prevent harm. Hunsberger, 570 F.3d at 555.

The court is guided by Anthony v. City of New York, 339 F.3d 129, 131 (2d Cir. 2003), in which the plaintiff brought a 42 U.S.C. § 1983 claim against officers who entered her apartment without a warrant. The officers were responding to a 911 call in which the caller reported being attacked by a man with a knife and a gun. Id. Upon entry, the plaintiff, a woman with Down Syndrome, was found alone in her apartment by the officers. Id. In her claim, the plaintiff argued that the officers violated her Fourth Amendment right to be free from unreasonable search and seizure. Id. at 135. The district court found that "no reasonable jury could conclude other than that exigent circumstances existed sufficient to justify the warrantless entry." Id. The plaintiff appealed, arguing that the officers could not rely on an "anonymous and uncorroborated 911 call to justify a warrantless entry into a private dwelling." Id. at 137. The Second Circuit, however, affirmed, reasoning that the call came from the same location to which police responded, "and more importantly, the caller described an immediate and deadly threat of harm" to which she was exposed." Id.

Gates argues in his motion that the reports received by the police were insufficient to support an objectively reasonable belief of exigent circumstances within 810 Mountain Avenue because they were uncorroborated third-party calls. Like the officers in Anthony, however, Officer Hill did not enter Gates's home based on an anonymous tip. To the contrary, Officer Hill acted upon two separate reports of a domestic disturbance. One of

6

these reports stated that a man was beating a woman, and that the caller could hear the punches landing. As the police dispatcher received two such calls, the reports were not uncorroborated, and because the second caller waited for Officer Hill on the front porch of 810 Mountain Avenue and reported she could still hear violence within, the calls were hardly anonymous. Officer Hill himself could hear shouting from outside the home; this is supported by footage from his body camera. Under these circumstances, the reports of callers describing an emergency at a different location and involving individuals other than the callers were sufficiently verified, and circumstances sufficiently urgent, to justify Officer Hill's entrance. See Anthony, 339 F.3d at 136 (finding that, when the caller expressed an immediate risk of harm to herself and where the address from which the call was placed was verified, the concern regarding the reliability of anonymous and uncorroborated calls is not implicated). See also Florida v. J.L., 529 U.S. 266, 270 (2000) (ruling that, while anonymous tips in and of themselves rarely "demonstrate the informant's basis of knowledge or veracity," there are situations in which an anonymous tip, if "suitably corroborated," provides "sufficient indicia of reliability").

Other cases have found exigent circumstances in similar circumstances. In People v. Higgins, 26 Cal. App. 4th 247, 251 (1994), the trial court ruled, and the appellate court upheld, that exigent circumstances were present when officers responded to an anonymous report of a domestic disturbance, and upon knocking on the door of the reported residence, were answered by a woman who denied them entrance into the home but appeared nervous, had a red mark under one eye, and claimed to be alone when officers could see a man inside the residence. Based on this, the officer's decision to force entry into the home was justified

by exigent circumstances. Id. And in United States v. Brooks, 367 F.3d 1128, 1130–31 (9th Cir. 2005), the Ninth Circuit upheld the warrantless entry of a police officer into a hotel room without permission of the defendant after receiving a call from a neighboring hotel guest and, after the door was opened by the defendant, noticing that the room was in "total disarray." In the above described cases, as in this one, there were present and ongoing risks of harm to individuals who were present in the residence that was entered by the officer.

Cases that have found no exigent circumstances in domestic disturbance situations are distinguishable by the lack of a present threat of violence. In Yengel, police responded to the defendant's house in response to a domestic disturbance call and entered without a warrant upon hearing the defendant had a grenade inside. 711 F.3d at 394–95. The Fourth Circuit held that exigent circumstances did not support this entry, noting that the defendant's wife had left by the time police arrived and the defendant agreed to speak with police on the front porch. Id. at 400. Similarly, in Singer v. Court of Common Pleas, Buck County, PA, 879 F.2d 1203, 1206 (3rd Cir. 1989), the Third Circuit found that no exigent circumstances justified warrantless entry into a defendant's home after reports of domestic violence because the victims of the alleged assault were no longer in the house when officers executed the search. In both these cases, there was no immediate threat of harm to any victim, and the police were aware of this fact.

When Officer Hill entered Gates's home, he held the reasonable belief that a violent domestic disturbance was ongoing, and that a woman was present in the residence and involved in the disturbance. This gave rise to a reasonable belief in a present emergency, justifying his warrantless entry. Once inside, Officer Hill held a warrant for Gates's arrest.

ECF No. 35-2. Officer Hills's search of Gates's person, leading to the discovery the firearm, was appropriate under the Fourth Amendment. United States v. Robinson, 414 U.S. 218, 224 (1973) ("It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment.").

## C.

The court now turns to Officer Hill's conversation with Gates—specifically, the questions posed and statements made after Gates had been put in handcuffs. Placing Gates in handcuffs clearly qualifies as a "restraint on freedom of movement of the degree associated with formal arrest." Stansbury, 511 U.S. at 322. The questions that followed thus occurred while Gates was in police custody. Despite Officer Hill's assertion at the hearing on this matter that he was merely "making conversation" with Gates during this time, inquiring into the ownership of a firearm found on Gates's person and asking Gates to volunteer his criminal history are two questions that were clearly likely to generate incriminating responses. The video footage of this exchange shows conclusively that Officer Hill never read Gates his rights, so all answers must be suppressed, in accordance with Gates's Fifth Amendment rights against self-incrimination.

The government argues that Gates's responses during his conversation with Officer Hill constitute "spontaneous utterances." "Volunteered statements of any kind are not barred by the Fifth Amendment." Innis, 446 U.S. at 300. Spontaneous utterances are deemed to be an exception to Miranda's procedural safeguards and thus need not be suppressed. United States v. Rhodes, 779 F.2d 1019, 1032 (4th Cir. 1985). Gates's statements here, however, were hardly spontaneous; this conversation was precipitated by Officer Hill's initial

9

questioning. Gates would not have made these statements were it not for Officer Hill's inquiry into his criminal history and comment that Gates was likely not permitted to be in a home with a firearm. While the government argues that Gates made statements following Officer Hill's first question that qualify as spontaneous utterances, even if his first response does not, the court declines to parse out one statement from another when the entire conversation was the result of an un-<u>Mirandized</u> custodial interrogation. Thus, all Gates's statements regarding his possession of the pistol and his past felony conviction are hereby **ORDERED** suppressed. In Officer Hill's body camera video, all Gates's statements made from 13:55–15:00 and 18:08–18:26 are excluded and may not be used by the government in the trial of this matter.

### III.

Officer Hill's entry into 810 Mountain Avenue was justified by exigent circumstances. After entering the premises and finding Gates, Officer Hill's arrested him, as required by the outstanding warrant. Officer Hill's search of Gates, revealing the firearm in his pocket, was within the bounds of the Fourth Amendment. <u>Chimel v. California</u>, 395 U.S. 752, 763 (1969) ("[Searches incident to arrest] have long been considered valid because of the need to 'remove any weapons that [the arrestee] might seek to use in order to resist arrest or effect his escape' and the need to prevent the concealment or destruction of evidence."). As such, Gates's request to suppress evidence of the firearm found during Officer Hill's search incident to arrest is **DENIED**.

Officer Hill's questioning of Gates, however, was a custodial interrogation made without reading Gates his <u>Miranda</u> rights. As such, it was a violation of his Fifth

Amendment rights. All statements made by Gates from 13:55–15:00 and 18:08–18:26 on Officer Hill's body camera video of the incident are **ORDERED** suppressed and may not be referenced by the government during trial.

An appropriate Order will be entered.

Entered: 12-06-2019

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge